## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO
### (Southern Division, Las Cruces)

| | |
|---|---|
| United States of America, ex rel. [UNDER SEAL]    ) <br> ) | Case No: 20cv31 CG KRS |
|       ) | **COMPLAINT FOR VIOLATION OF** |
|     Relator,     ) | **FEDERAL FALSE CLAIMS ACT [31** |
|       ) | **U.S.C. § 3729 et seq.]** |
|    v.     ) | |
|       ) | JURY TRIAL DEMANDED |
| [UNDER SEAL]     ) | |
|       ) | **FILED UNDER SEAL PURSUANT TO** |
|     Defendant.     ) | **31 U.S.C. § 3730(b)(2)** |
|       ) | |
| _____) | |

## DOCUMENT TO BE KEPT UNDER SEAL

1   Michael Allen*
    Kali Schellenberg*
2   Reed N. Colfax, Bar No. 9302
    RELMAN COLFAX, PLLC
3   1225 19th Street, NW, Suite 600
    Washington DC 20036
4   Telephone: (202) 728-1888
    Fax: (202) 728-0848
5   mallen@relmanlaw.com
    kschellenberg@relmanlaw.com
6   rcolfax@relmanlaw.com

7
    Robert K. Collins*
8   COLLINS LAW OFFICE, LLC
    P.O. Box 4786
9   Olathe, Kansas 66063
    Ph: (913) 538-7472
10  robert@collinslegal.com

11  *Attorneys for Relator*

12  *Pending admission *pro hac vice*

13

14              UNITED STATES DISTRICT COURT
                 DISTRICT OF NEW MEXICO
15             (Southern Division, Las Cruces)

16
    United States of America, ex rel. Margaret )   Case No: 20cv31 CG KRS
17  McGuinn                                     )
                                                )   **COMPLAINT FOR VIOLATION OF**
18          Relator,                            )   **FEDERAL FALSE CLAIMS ACT [31**
                                                )   **U.S.C. § 3729 et seq.]**
19          v.                                  )
                                                )   JURY TRIAL DEMANDED
20                                              )
    J.L. Gray Company, Inc.                     )   **FILED UNDER SEAL PURSUANT TO**
21                                              )   **31 U.S.C. § 3730(b)(2)**
            Defendant.                          )
22                                              )
                                                )
23  _____)

24                        **COMPLAINT**

25

26

27                            2

28      United States of America, ex rel. Margaret McGuinn v. J.L. Gray Company, Inc.
                                  COMPLAINT
29

INTRODUCTION

1.      Relator Margaret McGuinn ("McGuinn" or "Relator") brings this action against

J.L. Gray Company, Inc. ("Gray" or "Defendant"), under the False Claims Act, 31 U.S.C. § 3729

et seq., to recover federal funds Gray has received from the U.S. Department of Agriculture's

Rural Development ("USDA/RD") program through the use of knowingly false statements,

records and certifications with respect to the physical accessibility of at least seventy (70)

apartment complexes in New Mexico, Texas, Colorado, Utah and Arizona, and subsequent

knowingly false requests for payment of loan proceeds and rental subsidy funds.

2.      For the past seventy years, Congress has authorized and appropriated federal

funding to support the development of affordable rental housing for lower-income households in

the nation's rural areas.  Those programs, administered by USDA/RD, provide loans, loan

guarantees and rental subsidies to private entities—such as Gray—who promise to strictly

comply with statutory, regulatory and contractual provisions prescribed by USDA/RD

concerning the development and operation of the resulting rental properties.

3.      Among those provisions are the requirements to build and operate USDA/RD

multifamily apartment complexes in a manner that is accessible to people with disabilities.

Since at least 1973, such complexes built with federal funds have been required to comply with

specific architectural and programmatic accessibility standards under Section 504 of the

Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504").  Through the Fair Housing Act

("FHA"), 42 U.S.C. § 3601 et seq., as amended by the Fair Housing Amendments Act of 1988,

and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq., as

3

amended by the ADA Amendments Act of 2008, Congress imposed additional accessibility obligations on Gray and other USDA/RD housing providers. USDA/RD, the U.S. Department of Housing and Urban Development ("HUD"), and the U.S. Department of Justice ("DOJ") have promulgated accessibility regulations to clarify and amplify those obligations. Collectively, these accessibility provisions of Section 504, the FHA and the ADA are identified herein as the "Federal Accessibility Requirements."

4.      Gray—which has been a recipient of USDA/RD funds since at least 1978—is required, as a material condition of receiving loans, loan guarantees and rental subsidy funds from USDA/RD, to certify its compliance with the Federal Accessibility Requirements and to actually comply with those Requirements in the management and administration of properties operated with USDA/RD funds.

5.      With its involvement in the development, ownership or management of at least 70 affordable rental communities in New Mexico, Texas, Colorado, Utah and Arizona, Gray is one of the region's largest and most frequent recipients of USDA/RD funds. During the ten-year period preceding the filing of this Complaint (the "False Claims Period"), Gray received approximately $90 million in such funds.

6.      Notwithstanding its knowledge of the Federal Accessibility Requirements, Gray failed, throughout the False Claims Period, to develop and operate multifamily properties consistent with those obligations, resulting in apartment complexes that lack accessible dwelling units and accessible common areas required by federal law.

7.      Through periodic inspections by a neutral third-party accessibility consultant and

4

written reports specifying the areas of noncompliance, Gray had actual knowledge during the False Claims Period that many—if not all—of the USDA/RD affordable rental communities it owned or managed were out of compliance with the Federal Accessibility Requirements.

8.    On multiple occasions during the False Claims Period, Gray knowingly submitted records, statements, certifications and requests for payment to USDA/RD, or caused the same to be submitted, explicitly or implicitly claiming compliance with the Federal Accessibility Requirements, or representing that it would use USDA/RD monies to come into compliance, in order to receive federal funds from USDA/RD. Gray's knowingly false records, statements, certifications of compliance and requests for payment outlined below, made to secure as much as $90 million in federal funds, violate the False Claims Act, and deprive the federal government and people with disabilities of accessibility in dozens of developments in New Mexico and other states.

9.    Relator Margaret McGuinn has previously provided a written disclosure to the U.S. Department of Justice which includes substantially all of the material evidence and information she possesses concerning Gray's false records, statements, certifications and claims.

10.    Relator seeks to recover funds that Gray secured through false records, statements, certifications and claims made to USDA/RD, together with treble damages, appropriate civil money penalties, and attorneys' fees and costs, all under the False Claims Act. In addition, Relator seeks an appropriate share of the proceeds recaptured from Gray.

5

## JURISDICTION AND VENUE

11.     This action arises under the False Claims Act, 31 U.S.C. § 3729 et seq.  This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3730(b) and 3732(a).  This Court also has jurisdiction pursuant to 28 US.C. §§ 1331 and 1345.

12.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because the conduct proscribed by the False Claims Act and complained of herein took place in this District, and is also proper pursuant to 28 U.S.C. § 1391(b) and (c), because the acts and omissions complained of herein occurred in this District, and because, at all times material and relevant, Defendant resided in and transacted business in this District.

13.     As required by 31 U.S.C. § 3130(b)(2), Relator has provided to the Attorney General and to the United States Attorney for the District of New Mexico a statement of material evidence and information that she possesses regarding Defendant's false claims and certifications.

14.     Because the statement includes attorney work product of Relator's counsel, and was submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in this litigation, the Relator understands this statement to be confidential.

## PARTIES

15.     Margaret McGuinn is a resident of Las Cruces, New Mexico, who has worked as an Area Loan Specialist with USDA/RD since March 2009.  Between then and October 2018, her primary responsibilities in that job were to ensure compliance with Federal Accessibility Requirements and other federal obligations by owners and managers of USDA/RD multifamily

6

residential communities.

16.    The United States of America ("United States"), as the real party in interest in this litigation and through USDA/RD, provides housing-related funding to a variety of private entities so that they may provide housing to very-low-, low-, and moderate-income households[1] in rural areas throughout the United States. Receipt of the funds relevant to this action is contingent on certifications that the recipient has met and will meet a variety of federal obligations concerning the accessibility of that housing.

17.    Defendant Gray describes itself as "a fully integrated company that acquires, develops, and manages multi-family residential communities in the Southwest." It owns, develops and/or manages 70 USDA/RD multifamily residential communities (comprising roughly 2,300 units) in New Mexico, Texas, Colorado, Utah and Arizona, including 35 properties which McGuinn regularly monitored for compliance with the Federal Accessibility Requirements. Attached as Appendix A to this complaint is a list of properties owned,

---

[1] The USDA defines very-low, low, and moderate income by reference to standards established by HUD, which provide (generally) that a household with an income that does not exceed 50 percent of the Area Median Income ("AMI"), adjusted for household size in the applicable county, is very-low income; a household with an income that does not exceed 80 percent of the AMI is low income; and a household with an income that does exceed 80 percent of the AMI, but not by more than $5,500, is moderate income. 7 C.F.R. § 3560.11. For context, the U.S. Census Bureau's American Community Survey reports that median household income for New Mexico in 2017 was $46,744. As such, very-low-income households in New Mexico would have annual incomes less than around $23,372, and are expected to contribute 30% of that income toward rent and utilities, with USDA/RD rental subsidies making up the gap between household contribution and the market rent demanded by the owner.

7

developed and/or managed by Gray identified to date.

## FACTS

18.    Since at least June 28, 1978, Gray has been a recipient of various forms of federal housing and funds from USDA/RD.

19.    The programs administered by USDA/RD were originally created by the American Housing Act of 1949, Pub. L. No. 81-171, 63 Stat. 432 (1949) (current version at 42 U.S.C. § 1471 et seq.), which authorized the Secretary of Agriculture to fund the creation of rural housing. Pursuant to such authority, the Secretary has elected to provide:

    a.    Loans to support the development of farm labor housing ("Section 514" loans, codified at 42 U.S.C. § 1484);

    b.    Loans to support the development of housing for the elderly, handicapped persons, or families with low incomes ("Section 515" loans, codified at 42 U.S.C. § 1485); and

    c.    Rental assistance payments to owners of USDA/RD rural housing in order to make housing available to low-income occupants ("Section 521" subsidy payments, codified at 42 U.S.C. § 1490a).[2]

---

[2] The Secretary is also authorized to provide loan guarantees to support multifamily rental housing in rural areas ("Section 538" loans, codified at 42 U.S.C. § 1490p-2). One Gray managed property, Falcon Ridge in Hatch, NM, received a Section 538 guaranteed loan of $1,332,000 in 2011.

8

20.    During the False Claims Period, Gray and its agents have received each kind of federal funding described in ¶ 19, above, for the construction of new multifamily residential communities, rehabilitation of existing multifamily residential communities, or rental subsidies for low-income households living in those communities.

21.    This includes at least $7 million in Section 514/515 construction loan funds for the new construction or rehabilitation of 9 of the 70 properties in its USDA/RD portfolio.

22.    This also includes USDA/RD rental subsidies for approximately 82% of the 2,300 units that Gray owns and/or manages, in the total amount of between $4 million and $9 million each year during the False Claims Period.  USDA/RD will continue to make such payments for the foreseeable future.

23.    When acting as a manager of USDA/RD-supported developments, Gray also received funds, including a management fee, through borrowers who were receiving the above USDA/RD funds.

24.    Throughout the False Claims Period, in her role as an Area Loan Specialist in the USDA/RD Las Cruces office, McGuinn was the person principally responsible for overseeing Gray's compliance with the Federal Accessibility Requirements and other obligations to the agency for 35 USDA/RD-assisted properties in Southern New Mexico.

25.    In that role, she regularly came into contact with the officers, agents and employees charged with developing, administering and operating USDA/RD-assisted properties owned and/or managed by Gray.

26.    Her interaction with Gray and its agents included reviewing applications for new

9

construction or rehabilitation loans, assurances and certifications; reviewing management agreements; attending loan closings; conducting desk audits, compliance reviews and on-site inspections of Gray properties; issuing corrective action plans and monitoring progress towards compliance; and analyzing rental assistance applications and agreements.

27.    Because of her role, she became intimately familiar with the operation of the 35 properties owned and/or managed by Gray, and with the certifications required in connection with the activities outlined in ¶ 19.

28.    Because Gray's other properties in New Mexico, Arizona, Colorado, Texas and Utah share common design features with the 35 properties under her supervision, McGuinn has reason to believe that similar violations of the Federal Accessibility Requirements may exist at those properties as well.

### Federal Accessibility Requirements

29.    As a recipient of federal funds, Gray must certify compliance with the Federal Accessibility Requirements, and *actually comply* with the same.

30.    The Federal Accessibility Requirements mandate that apartment buildings be built so that they are accessible to people with mobility impairments (e.g., people who use wheelchairs, walkers or canes, or who have breathing or heart problems that make it hard to walk significant distances).

31.    When federal funding is involved, the law goes a step further, requiring that certain apartment units have enhanced features in bathrooms, kitchens and other rooms that make them accessible to people with significant mobility disabilities, and that specified common

10

areas be accessible to them.

32.    The laws are specific, providing detailed measurements for compliance, because a door that is too narrow, a threshold that is too high, or a sink that cannot be approached in a wheelchair can each render an entire apartment unit or common area entirely inaccessible.

33.    As the Judiciary Committee recognized when enacting the Fair Housing Amendments Act of 1988, "a person using a wheelchair is just as effectively excluded from the opportunity to live in a particular dwelling by the lack of access into a unit and by too narrow doorways as by a posted sign saying 'No Handicapped People Allowed.'" H.R. REP. 100-711, at 25, 1988 U.S.C.C.A.N. 2173, 2186.

34.    Congress enacted Section 504 in 1973, pursuant to the authority of the U.S. Constitution's Spending Clause, to ensure that entities receiving federal funds were bound by the material requirement that they not discriminate on the basis of disability.  Applicants for, and recipients of, federal funds from any federal department or agency are obligated to certify their prospective and ongoing compliance with Section 504 and the funding agency's regulations adopted to implement the requirements of the statute.

35.    The USDA promulgated regulations implementing Section 504 in 1982, requiring Gray and other recipients of USDA/RD funds to comply with the accessibility requirements of Section 504. *See* 7 C.F.R. pt. 15b. The regulations mandate that facilities constructed by recipients of federal funds built for first occupancy after June 10, 1982, or substantially altered, are subject to certain design and construction requirements. These requirements include that common areas and at least five percent (5%) of apartment units in each building (or a minimum

11

United States of America, ex rel. Margaret McGuinn v. J.L. Gray Company, Inc.
COMPLAINT

of one unit) comply with the heightened accessibility requirements defined by the Uniform

Federal Accessibility Standards ("UFAS").[3] 7 C.F.R. §§ 15b.19, 15b.41.

36.     Pursuant to the USDA/RD regulations and UFAS, accessible units must include

elements such as:

a.      Lever hardware, a 36-inch-wide accessible route, and a minimum of 32-

inch door openings;

b.      Accessible kitchens, which are required to have a sufficiently wide clear

workspace, 34-inch maximum counter heights, open or removable sink fronts, and front

control knobs on stoves;

c.      Accessible bathrooms, which must have knee clearance under sinks with

insulated pipes, toilet grab bars behind and beside the toilet, and an in-tub seat.

37.     In addition, USDA/RD regulations and UFAS have detailed requirements

governing accessibility of the multifamily housing development as a whole, including:

a.      Parking, with a minimum number of accessible spaces, and slopes not to

exceed 2%;

b.      Accessible routes, which must be at least 36 inches wide, linking parking,

units, and all common elements;

_____

[3] Available at https://www.access-board.gov/guidelines-and-standards/buildings-and-sites/about-the-aba-standards/ufas.

12

c.      Ramps, which cannot have slopes exceeding 5%, and requirements for handrails for ramps of a certain rise or length;

d.      Common areas, with a requirement that doorways have a clear opening of 32 inches and thresholds not exceeding ½ inch height;

e.      Accessible mailboxes, dumpsters, switches, outlets, and thermostats for common areas;

f.      Common area laundry, which must have sufficient space in front of washer/dryers, at least one front load washer, and counter top heights between 28 to 34 inches.

38.      Pursuant to the FHA, as amended, all common areas and all ground floor units (and any units served by an elevator) in multifamily apartment buildings containing four (4) or more units, built for first occupancy after March 13, 1991, must contain the following design and construction elements:

a.      Public-use and common-use areas that are readily accessible to, and usable by, people with disabilities;

b.      Doors into and within covered units that are sufficiently wide to allow passage by people in wheelchairs;

c.      An accessible route into and through the dwelling;

d.      Light switches, electrical outlets, thermostats and other environmental controls that are placed in accessible locations;

e.      Reinforcements in bathroom walls that allow for the later installation of

13

grab bars; and

f.        Kitchens and bathrooms that are usable, such that an individual in a

wheelchair can maneuver about the space. 42 U.S.C. § 3604(f)(3)(c).

39.    FHA design and construction requirements are further fleshed out in the

regulations.  HUD promulgated final FHA design and construction regulations in January 1989,

*see* 24 C.F.R. §100.205, and published the final Fair Housing Accessibility Guidelines on March

6, 1991.  *See* 56 Fed. Reg. 9,472.

40.    Congress enacted the ADA in 1990.  In pertinent part, it requires that places of

public accommodation—such as rental offices, visitor parking spaces and other amenities held

out to the general public—comply with stated accessibility requirements.  Pursuant to

Congressional authority, the DOJ promulgated regulations on October 11, 2016, *see* 28 C.F.R.

pt. 36, with the purpose of prohibiting discrimination on the basis of disability by mandating

certain design and construction requirements.

41.    The ADA and its implementing regulations require that public areas of

multifamily apartment buildings built for first occupancy or rehabilitated after January 26, 1993,

be subject to the design and construction requirements contained in the Americans with

Disabilities Act/Accessibility Guidelines ("ADA/AG").  *See* 42 U.S.C. § 12183; 28 C.F.R. §§

36.401, 36.402, 36.406.

42.    Further, as a recipient of funds from the USDA/RD through Section 514/515

loans, and Section 521 subsidy payments, Gray is also subject to USDA/RD regulations, codified

at 7 C.F.R. pt. 3560, which describe the requirements, policies, and procedures for those

14

programs, including that design and construction of covered properties must be in conformance

with the Federal Accessibility Requirements mentioned above, and all other federal, state and

local requirements.

43.    The properties listed in Appendix A, which fall under the above-described

parameters, are subject to Federal Accessibility Requirements listed above and are described

herein as the "Covered Properties".

<u>Examples of Gray's Violations of Federal Accessibility Requirements</u>

44.    By way of example and not as an exhaustive inventory, Gray's noncompliance

with the Federal Accessibility Requirements includes the failure to design and construct covered

dwelling units in the Covered Properties so that:

a.    Doors in units that are sufficiently wide so as to allow passage into

kitchens, bathrooms, bedrooms and other areas in the units by people using wheelchairs;

b.    An accessible route into and through the unit is provided, including access

to patios, balconies and other outside areas;

c.    Bathrooms have sufficient clear floor space to allow a person in a

wheelchair to maneuver about the space;

d.    Kitchens have sufficient clear floor space to allow a person in a

wheelchair to maneuver about the space; and

e.    Light switches, electrical outlets, thermostats and other environmental

controls are in accessible locations.

45.    Gray's noncompliance also includes failing to design and construct the public and

common areas of many of the Covered Properties so that they are readily accessible to and usable by people with disabilities. By way of example and not as an exhaustive inventory, some of the violations in the common areas of the Covered Properties include the following:

    a.    Sidewalks leading up to the complex entrance in poor repair;

    b.    Lack of readily accessible routes from the parking lot to complex and from the units to common areas, such as laundry rooms, common bathrooms, and office areas;

    c.    Thresholds at property office entrances that are too high for a wheelchair user to roll over;

    d.    Parking access aisles that are too narrow for wheelchair users, lack of designated accessible parking spaces, and excessive slopes in accessible parking spaces;

    e.    Lack of levered faucet or door handles in common area restrooms and kitchens;

    f.    Lack of accessible laundry machines and too high counter tops in laundry area;

    g.    Common area bathroom sinks lacking sufficient height, knee/reach clearance, and sufficient floor space;

    h.    Inaccessible ramp routes;

    i.    Mailboxes, dumpster openings and common restroom mirrors that are too high for wheelchair users; and

    j.    Lack of visual or tactile signage in common areas.

46.    The following specific examples are illustrative, and not exhaustive, of

16

Defendant's pattern and practice of violating the Federal Accessibility Requirements across the 35 properties that McGuinn observed during the False Claims Period, and which McGuinn has reason to believe is true of Gray's entire portfolio of at least 70 developments:

### Sierra Vista Apartments (Deming, NM)

47.    Sierra Vista, in Deming, New Mexico, is a covered multifamily complex consisting of 25 units that was completed in 2013. During visits to the property on two occasions over the course of two years, McGuinn observed continuing violations of the Federal Accessibility Requirements including, but not limited to, the following:

    a.    Common area kitchen lacks an accessible sink;

    b.    Laundry room has too high a threshold, acting as a barrier for persons in a wheelchair;

    c.    Laundry room has too high a counter top;

    d.    Units designated as accessible lack kitchen cabinetry and hardware at an accessible height, meaning a person in a wheelchair cannot even reach the bottom shelf of a cabinet to retrieve or put away items;

    e.    Units designated as accessible lack 30" of clear workspace in the kitchen, leaving wheelchair users without required counter prep space;

    f.    Units designated as accessible lack an accessible refrigerator, meaning a person in a wheelchair cannot reach to put away or retrieve food items without the possibility of being hurt;

    g.    Units designated as accessible lack an open under-counter sink area with

17

covered plumbing in the bathroom, making it inaccessible to wheelchair users;

h.    Medicine cabinets in designated units are mounted too high, rendering them inaccessible to persons in a wheelchair.

### Falcon Ridge Apartments (Hatch, NM)

48.    Falcon Ridge Apartments in Hatch, New Mexico, is a covered multifamily complex consisting of 72 units that was completed in 2008. During visits to the property on one occasion over the course of five years, McGuinn, through her assistant, observed continuing violations of the federal accessibility standards including, but not limited to, the following:

a.    Designated accessible parking spaces have an overly steep slope, raising the potential for a person in a wheelchair to roll into traffic;

b.    Sidewalks have many unbeveled trip points throughout the property, creating impediments on paths of travel that are required to be accessible to people with disabilities;

c.    Common area kitchen lacks an accessible sink;

d.    Common area bathroom mirrors are mounted too high, rendering them inaccessible to persons in a wheelchair;

e.    Environmental controls are placed at heights that are beyond the reach of a person in a wheelchair;

f.    Units designated as accessible lack kitchen cabinetry with proper hardware at an accessible height, meaning a person in a wheelchair cannot even reach the bottom shelf of a cabinet to retrieve or put away items;

18

g.    Units designated as accessible have counters and sinks that are too high, rendering them inaccessible to a person in a wheelchair;

h.    Medicine cabinets in designated units are mounted too high, rendering them inaccessible to a person in a wheelchair;

i.    Units designated as accessible lack grab bars in the tub, causing a slip and fall danger.

## **Valley View Apartments (Silver City, NM)**

49.    Valley View, in Silver City, New Mexico, is a covered multifamily complex consisting of 32 units that was completed in 1995. During visits to the property on two occasions over the course of eight years, McGuinn observed continuing violations of the federal accessibility standards including, but not limited to, the following:

a.    Lack of an accessible route from the parking lot and other arrival points to individual units and other common areas of the property;

b.    Property does not meet the 5% accessible unit requirement, causing accessible units to not be available to tenants and applicants in need;

c.    Parking access aisles are too narrow, and therefore prevent a wheelchair user from parking and having sufficient room to set up and transfer to a wheelchair to enter a dwelling or the leasing office;

d.    Parking spaces designated as accessible are at an overly steep slope, raising the dangerous possibility that a person in a wheelchair could roll into traffic;

e.    Sidewalks have many unbeveled trip points throughout the property,

19

United States of America, ex rel. Margaret McGuinn v. J.L. Gray Company, Inc.
COMPLAINT

creating impediments on paths of travel that are required to be accessible to people with

disabilities;

      f.      Ramps in parking lot have too steep a slope, making it dangerous for a

person in a wheelchair to use;

      g.      Dumpster opening is too high, rendering the dumpster inaccessible to

wheelchair users;

      h.      Staircases do not have cane blocking, causing a head injury danger for

sight impaired persons;

      i.      Handrails on staircases are too high;

      j.      Staircases have open risers, causing a trip hazard for elderly people and

people with reduced or limited mobility;

      k.      Visual and tactile signage is missing from the interior of the office

building, preventing a vision-impaired person from being able to distinguish between the

office, closets, and restrooms;

      l.      Laundry room sink lacks proper height, knee and reach clearance,

rendering it inaccessible to wheelchair users;

      m.      Units designated as accessible have environmental controls placed at

heights beyond the reach of a person in a wheelchair;

      n.      Kitchen clearances are insufficient to allow a person in a wheelchair to

maneuver about the space;

      o.      Units designated as accessible lack kitchen cabinetry at an accessible

20

height, meaning a person in a wheelchair cannot even reach the bottom shelf of a cabinet to retrieve or put away items;

p.      Units designated as accessible lack an open under-counter sink area with covered plumbing in the kitchen, making it inaccessible to wheelchair users;

q.      Units designated as accessible lack 30" of clear workspace in the kitchen, leaving wheelchair users without required counter prep space;

r.      Units designated as accessible lack an accessible stove, meaning a person in a wheelchair cannot use the stove without the possibility of being burned;

s.      Units designated as accessible lack a separate switch for a rangehood fan and a light at an accessible height, as such these functions are inaccessible to a person in a wheelchair;

t.      Units designated as accessible lack an accessible refrigerator, meaning a person in a wheelchair cannot reach to put away or retrieve food items without the possibility of being hurt;

u.      Units designated as accessible lack an open under-counter sink area with covered plumbing in the bathroom, making it inaccessible to wheelchair users;

v.      Units designated as accessible lack grab bars in the tub, causing a slip and fall danger.

### Franklin Vista VII (Anthony, NM)

50.     Franklin Vista VII Apartments in Anthony, New Mexico, is a covered multifamily complex consisting of 24 units that was completed in 2008. During visits to the

21

property on three separate occasions over the course of eight years, McGuinn observed

continuing violations of the Federal Accessibility Requirements including, but not limited to, the

following:

      a.     Sidewalks are in need of repair throughout the property, creating

impediments on paths of travel that are required to be accessible to people with

disabilities;

      b.     Designated accessible parking spaces have too steep a slope, raising the

potential for a person in a wheelchair to roll into traffic;

      c.     Parking ramp near office has an overly steep slope, making it dangerous

for a person in a wheelchair;

      d.     Units designated as accessible lack 32" clear width in a bathroom

doorway, rendering the bathroom inaccessible to wheelchair users;

      e.     Units designated as accessible lack an accessible stove, meaning a person

in a wheelchair cannot use the stove without the possibility of being burned;

      f.     Units designated as accessible lack an accessible counter height, meaning

current heights are beyond the reach of a person in a wheelchair;

      g.     Units designated as accessible lack 30" of clear workspace in the kitchen,

leaving wheelchair users without required counter prep space;

      h.     Units designated as accessible lack an accessible refrigerator, meaning a

person in a wheelchair cannot reach to put away or retrieve food items without the

possibility of being hurt;

22

i.    Units designated as accessible lack kitchen cabinetry at an accessible height, meaning a person in a wheelchair cannot even reach the bottom shelf of a cabinet to retrieve or put away items;

j.    Mailboxes for accessible units are too high, rendering the mailboxes inaccessible to wheelchair users.

### Inspiration Heights (Ruidoso Downs, NM)

51.    Inspiration Heights in Ruidoso Downs, New Mexico, is a covered multifamily complex consisting of 48 units that was completed in 1995. During visits to the property on five separate occasions over the course of eight years, McGuinn observed continuing violations of the Federal Accessibility Requirements including, but not limited to, the following:

a.    Lack of an accessible route from the parking lot and other arrival points to individual units and common areas of the property due to the unmitigated steep slopes on the property, making it hazardous to a person using a wheelchair or walker;

b.    While federal law requires the property to have at least three (3) units complying with the Uniform Federal Accessibility Standards (UFAS), the property has only two (2) units that purport to meet those standards, but do not in fact do so;

c.    Sidewalks are in poor repair throughout the property, creating impediments on paths of travel that are required to be accessible to people with disabilities;

d.    Thresholds at entrance of units designated as accessible are too high and act as barriers to wheelchair users;

23

e.    Threshold at entrance of the property office is too high and acts as a barrier to wheelchair users;

f.    Parking access aisles are too narrow, preventing a wheelchair user from parking and having sufficient room to set up and transfer to a wheelchair to enter a dwelling or the leasing office;

g.    Parking lot lacks the required number of accessible parking spaces;

h.    Designated accessible parking spaces have too steep a slope, raising the potential for a person in a wheelchair to roll into traffic;

i.    Ramp outside property office has an overly steep slope, making it dangerous for a person in a wheelchair;

j.    Ramps that change direction on the property do not level off at a 5' x 5' landing, causing a dangerous condition for wheelchair users;

k.    Stairs at the property have open risers, causing a trip and fall hazard;

l.    Route to the laundry area is not accessible; threshold to the laundry room is too high, rendering it inaccessible to wheelchair users;

m.    Environmental controls are placed at heights beyond the reach of a person in a wheelchair;

n.    Kitchen clearances are insufficient to allow a person in a wheelchair to maneuver about the space;

o.    Units designated as accessible lack an accessible stove, meaning a person in a wheelchair cannot use the stove without the possibility of being burned;

24

United States of America, ex rel. Margaret McGuinn v. J.L. Gray Company, Inc.
COMPLAINT

p.      Units designated as accessible lack grab bars in the tub, causing a slip and fall danger.

### Transition Plans

52.      Pursuant to USDA/RD internal procedures, upon finding instances of noncompliance, such as those described above, McGuinn issued a letter to Gray within thirty (30) days of her inspection, providing Gray details concerning the noncompliance.

53.      USDA/RD regulations in effect during the False Claims Period required Gray to conduct a self-evaluation of each Covered Property to determine whether it was in compliance with the Federal Accessibility Requirements. 7 C.F.R. § 15b.8(c).

54.      When "structural changes to facilities are necessary to meet" the Federal Accessibility Requirements, Gray is obligated to develop a "transition plan setting forth the steps necessary to complete such changes." 7 C.F.R. § 15.b.18(g).  Each plan must "[i]dentify physical obstacles . . . that limit the accessibility to [people with disabilities]"; "[d]escribe in detail the methods that will be used to make the facilities accessible"; and "[s]pecify the schedule for taking the steps necessary to achieve full accessibility . . . and if the time period of the transition plan is longer than one year, identify steps that will be taken each year of the transition period." *Id.*

55.      Pursuant to 7 C.F.R. § 15b.8(c), McGuinn directed Gray to conduct a self-evaluation on each Covered Property, and to enter into a Transition Plan for each Covered Property not in compliance with the Federal Accessibility Requirements.

56.      To create Transition Plans, Gray hired R.H. Zeffert & Associates, Inc. ("Zeffert").

57.     Zeffert found multiple instances of noncompliance with the Federal Accessibility

Requirements within Gray properties, which it reported to Gray, and which were listed in the

Transition Plans that Gray submitted to McGuinn's office.

58.     The following specific examples are illustrative, and not exhaustive, of the

failings Zeffert documented in Transition Plans across the 35 properties that Relator observed

during the False Claims Period:

      a.      On October 9, 2012, Zeffert inspected Rio Mimbres I, a Covered Property

in Deming, New Mexico, consisting of 36 units, ready for first occupancy on January 6,

1983. The Transition Plan described the following:

          i.      Multiple instances of noncompliance with Federal Accessibility

Requirements related to accessible units, including insufficient clearance under

the kitchen sinks, insufficient work space in the kitchens, and breaker panels too

high to be reachable by a person in a wheelchair. As such, neither of the units

designated as UFAS-accessible actually complied with the Federal Accessibility

Requirements.

          ii.     Multiple instances of common area noncompliance with Federal

Accessibility Requirements, including noncompliant curb cuts, ramps that were

too steep, inaccessible mail and laundry facilities, and conditions that posed risk

of injury to residents with visual impairments.

      b.      On October 9, 2012, Zeffert inspected Rio Mimbres II, a Covered

Property in Deming, New Mexico, consisting of 24 units, ready for first occupancy on

26

United States of America, ex rel. Margaret McGuinn v. J.L. Gray Company, Inc.
COMPLAINT

January 3, 1992. The Transition Plan described the following:

      i.      Multiple instances of noncompliance with Federal Accessibility

Requirements related to accessible units, including wall cabinets that were too

high, refrigerators placed in inaccessible locations and bathtubs without proper

grab bars. As such, neither of the units designated as UFAS-accessible actually

complied with the Federal Accessibility Requirements.

      ii.     Multiple instances of common area noncompliance Federal

Accessibility Requirements, including noncompliant curb cuts, ramps that were

too steep and conditions that posed risk of injury to residents with visual

impairments.

      c.     On June 9, 2011, Zeffert inspected Valley View, a Covered Property in

Silver City, New Mexico, consisting of 32 units, ready for first occupancy on January 1,

1996. The Transition Plan described the following:

      i.      Multiple instances of noncompliance with Federal Accessibility

Requirements related to accessible units, including inaccessible kitchen sinks,

doors that provide insufficient clearance, and breaker panels too high to be

reachable by a person in a wheelchair. As such, neither of the two units

designated as UFAS-accessible actually complied with the Federal Accessibility

Requirements.

      ii.     Ten apartments needed to be modified to meet the FHA's

adaptability requirements.

27

iii.     Multiple instances of common area noncompliance with the

Federal Accessibility Requirements, including landings and parking spaces that

are not level, a noncompliant washing machine, and conditions that posed risk of

injury to residents with hearing impairments.

d.     On June 9, 2011, Zeffert inspected Central Apartments, Covered Property

in Santa Clara, New Mexico, consisting of 22 units, ready for first occupancy on October

29, 1998. The Transition Plan described the following:

i.     Multiple instances of noncompliance with Federal Accessibility

Requirements related to its accessible unit, including a toilet without accessible

clearance, inaccessible cabinets in the kitchen and a bathtub without proper grab

bars. As such, the unit designated as UFAS-accessible did not actually comply

with the Federal Accessibility Requirements.

ii.     Twelve apartments needed to be modified to meet the FHA's

adaptability requirements.

iii.     Multiple instances of common area noncompliance with the

Federal Accessibility Requirements, including landings and parking spaces that

are not level, a noncompliant washing machine, and conditions that posed risk of

injury to residents with hearing impairments.

e.     On October 14, 2005, Zeffert inspected Mesquite Village, a Covered

Property in Las Cruces, New Mexico, consisting of 48 units, ready for first occupancy on

March 22, 2005. Although Mesquite Village had just been built with the assistance of a

28

$2,951,638.89 Section 514 loan, the Transition Plan described the following:

      i.      Multiple instances of noncompliance with Federal Accessibility Requirements related to accessible units, including insufficient workspaces and turning radiuses in the kitchens, and ovens without front controls. As such, the three units designated as UFAS-accessible did not actually comply with the Federal Accessibility Requirements.

      ii.      Multiple instances of common area noncompliance with the Federal Accessibility Requirements, including step sidewalks and ramps lacking handrails, a playground area lacking clear access for people in wheelchairs, as well as conditions that posed risk of injury to residents with hearing impairments.

59.     On information and belief, the inaccessible conditions in the Transition Plans described above remain in existence as of the filing of this Complaint.

60.     In addition to the specific accessibility violations outlined above, Gray does not maintain the requisite number of UFAS-accessible apartment units. In at least 15 developments, Gray has not facially made the required number of apartments accessible. And while it claims to maintain the required number of UFAS-accessible apartment units in 28 of the USDA/RD-assisted properties under McGuinn's review, both McGuinn and Zeffert determined that many of the designated units do not comply with Federal Accessibility Requirements; a non-exhaustive list of such examples includes: Central Apartments, Desert Sun Apartments, Desert Sun Apartments II, Falcon Ridge Apartments, Franklin Vista I Apartments, Franklin Vista III Apartments, Franklin Vista V Apartments, Franklin Vista VI Apartments, Las Rosas

29

Apartments, Mesquite Village, Mountain View Apartments, Ruth Visage Apartments,

Sacramento Apartments, Sierra Vista Apartments, Valle Verde II Apartments, and Valley View

Apartments.

Gray's Certifications Regarding Compliance with Federal Accessibility Requirements

61.    As a precondition for receiving the funds mentioned in ¶ 19, Gray must certify

compliance with the Federal Accessibility Requirements, other civil rights laws protecting

people with disabilities, and the regulations pursuant to which USDA/RD administers its funding

programs.

62.    Those certifications include, but are not limited to, the following:

a.    Throughout the False Claims Period, Gray applied for USDA/RD loan or

rental subsidy funds, and completed Form SF-424 and its attachments (Form SF-424D

for construction projects and Form SF-424B for non-construction projects).  For each

such application, an agent for Gray made specific certifications of compliance with the

Federal Accessibility Requirements, and certified that the statements in the application

were true and that Gray agreed, subject to criminal, civil or administrative penalties, to

comply with any resulting terms if it accepted USDA/RD funds.

b.    During the False Claims Period, when Gray entered into loan agreements

with USDA/RD for purposes of new construction or substantial rehabilitation, it used

Form RD 3560-33 or RD 3560-34.  ¶¶ 3 and 7 each contain explicit certifications

requiring Gray to comply with the Federal Accessibility Requirements.

c.    As part of the inducement to USDA/RD to make each Section 514 or

30

Section 515 loan during the False Claims Period, Gray also submitted a Form RD 1924-25, pursuant to which its architect certified that construction plans fully complied with the Federal Accessibility Requirements.

       d.      During the False Claims Period, when Gray acted as a manager of a property with a USDA/RD loan agreement or monthly rental subsidies, it was required to complete a Form RD 3560-13 which, at ¶ 10, contains a certification that Gray will comply with Federal Accessibility Requirements.

       e.      Throughout the False Claims Period, in order to secure monthly rental subsidy funds for very low-, low- and moderate-income households living in approximately 1,888 units receiving USDA/RD assistance, Gray was required to provide certifications of compliance with Federal Accessibility Requirements related to annual project budgets, utility allowances and calculation of individual household incomes (upon which rent subsidy amounts are determined). The system through which Gray made explicit and implied certifications regarding its compliance is called the Management Interactive Network Connection ("MINC"). To register for MINC, Gray certified that it understood and agreed to abide by the management plan and certifications for each project, in compliance with 7 C.F.R § 3560.102—which provides that borrowers have final responsibility for ensuring that operations comply with the terms of all loan and grant documents, Agency requirements and applicable laws.

      63.      During the False Claims Period, Gray executed the certifications in applications for construction loans, loan agreements and architect certifications for the following properties

31

that were newly constructed or substantially rehabilitated with Section 514 or Section 515 loans: El Camino Real, Falcon Ridge Apartments, Mountain View Apartments, Paseo Del Oro Apartments LLP, Sierra Vista Apartments, Valle Del Sol Apartments, Presidio Dolores Apartments, Logan Estates Apartments and Vista Rita Blanca Apartments.

64.     During the False Claims Period, Gray executed the certifications in management agreements for all 70 properties listed in Appendix A.  Each such management agreement covered a period of three years, at the end of which Gray was required to execute a new management agreement and certification.

65.     During the False Claims Period, Gray repeatedly executed certifications related to monthly rental subsidies for 66 properties listed in Appendix A.

66.     During the False Claims Period, Gray provided the express and implied civil rights certifications mentioned in ¶ 62, in furtherance of its applications for the federal housing funds mentioned in ¶ 19.

67.     As described in ¶¶ 44-51, 58, & 60, contrary to Gray's certifications of civil rights compliance, many of these 70 multifamily projects do not contain the minimum number of units accessible to people with mobility impairments that are required by the Federal Accessibility Requirements, and/or contain common use elements that do not comply with those requirements.

68.     As described in ¶¶ 44-51, 58, & 60, contrary to Gray's certifications of civil rights compliance made during the False Claims Period, Gray maintained neither policies nor practices to ensure that multifamily housing projects assisted with federal funds contained the minimum number of units accessible to people with mobility impairments that is required by the Federal

32

Accessibility Requirements.

Gray's Certifications Regarding Compliance with USDA/RD Regulations and Section 521

Rental Subsidy Representations

69.    In addition to compliance with the Federal Accessibility Requirements, the forms described in ¶ 62 also require Gray to certify that it is complying with USDA/RD regulations.

70.    As described above, ¶¶ 53-54, USDA/RD requires Gray to conduct a self-evaluation and create Transition Plans when a development is not in compliance with the Federal Accessibility Requirements.

71.    An important part of those requirements is that Gray "take...appropriate remedial steps" to eliminate the discrimination uncovered as part of the self-evaluation. 7 C.F.R. § 15b.8(c)(1)(iii).

72.    Throughout the False Claims Period, Gray did not take appropriate steps to address the discriminatory conditions in its developments within the three-year timeframe contemplated by the Transition Plan, and thereafter.

73.    By way of example, the Transition Plans for the properties listed in ¶ 58, included a three-year timetable for remediation and estimated costs of remediation, which were as follows: Rio Mimbres I, \$31,733.12; Rio Mimbres II, \$46,706.22; Valley View, \$33,487.37; Central Apartments, \$34,407.94; Mesquite Village, \$16,364.95.

74.    On information and belief, the inaccessible conditions noted in the Transition Plans described in ¶ 58 remain in existence as of the filing of this Complaint.

75.    As such, for Rio Mimbres I, Rio Mimbres II, Valley View and Central

33

Apartments, Gray has not updated its Transition Plan or remediated the issues described in the Transition Plan in over eight years. For Mesquite Village, Gray has maintained the same Transition Plan without remediation since 2006, nearly fourteen years ago.

76.     Per 7 C.F.R. § 3560.303, borrowers must submit a proposed annual housing project budget to USDA/RD prior to the start of the housing project's fiscal year. The capital budget section of the annual project budget must include anticipated expenditures on the project's long-term capital needs as specified in 7 C.F.R. § 3560.103. This includes an accounting of "Section 504 and other Fair Housing compliance modifications and maintenance." 7 C.F.R. § 3650.303(b)(1)(v)(H). All requests for increases in rents or reserve account use is documented on the budget form RD 3560-7.

77.     Gray submitted annual budget documents to USDA/RD, seeking USDA/RD approval of expenditures from its reserve account to remediate specific areas of noncompliance noted in its Transition Plans, as well as other instances of noncompliance.

78.     Gray also sought increases in Section 521 rental assistance funds to cover the costs of remediating their noncompliance.

79.     However, upon information and belief, the Section 521 funds, which Gray represented to USDA/RD that it would use to make the necessary repairs at multiple properties, were not used for that purpose.

80.     The continuing existence of noncompliance at Gray properties, illustrated above in Mesquite Village, Rio Mimbres I, Rio Mimbres II, Valley View and Central Apartments, is testament to this practice.

34

United States of America, ex rel. Margaret McGuinn v. J.L. Gray Company, Inc.
COMPLAINT

81.     As such Gray's representations in its budget, submitted through the MINC system, were false and caused USDA/RD to pay out additional Section 521 subsidy monies which were not used for the purposes Gray represented.

### Gray's Knowledge

82.     As a "a fully integrated company that acquires, develops, and manages multi-family residential communities in the Southwest," Gray knows or should know about the Federal Accessibility Requirements and USDA/RD regulations.

83.     Gray was also made aware of its lack of accessibility by an independent accessibility expert, Zeffert, as described in ¶¶ 56-58.

84.     Moreover, as described in ¶ 52, McGuinn sent letters to Gray outlining findings of noncompliance at individual properties.

85.     McGuinn also repeatedly informed Gray of its overall lack of compliance, and of the importance of complying with Federal Accessibility Requirements and USDA/RD regulations.

86.     Given the above, Gray could not rely in good faith on any indication that it did not need to comply with the Federal Accessibility Requirements and USDA/RD regulations, especially as Gray knew McGuinn was the agency official overseeing their compliance, and responsible for approving budget-related requests.

87.     Gray made the certifications described in ¶ 62, despite its knowledge and/or in reckless disregard of its lack of compliance with the Federal Accessibility Requirements and its demonstrated practice not to take future actions to come into compliance, as described in ¶¶ 44-

35

60.

88.    In her position, McGuinn reviewed Gray's files, which included the certifications referenced in ¶ 62, and saw the signatures of agents for Gray on those documents. Those agents included President J. Scot Fishburn.

89.    In doing the acts or in omitting to act as alleged herein, each employee or officer of Gray was acting in the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employee or officer as agent were subsequently ratified and adopted by Gray as principal.

Gray's Certifications of Compliance are False Records or Statements on Which Subsequent Claims for Payment Are Based

90.    As set forth herein, and supported by her good faith investigation, McGuinn alleges that Gray knowingly has caused, and continues to cause, the submission of false or fraudulent claims for payment to USDA/RD for support of the properties mentioned in Appendix A.

91.    Through its multiple certifications of compliance, Gray caused USDA/RD and the public to believe that it was complying with the Federal Accessibility Requirements and USDA/RD regulations and, as a consequence, USDA/RD continued to pay Gray in response to its requests for payment.

92.    While McGuinn reported the violations she saw and advocated for stricter compliance, including withholding funds from Gray, upon information and belief, the National Office of USDA/RD was never made aware of Gray's false certifications.

36

93.    In addition to being integral to the federal government's commitment to non-discrimination on the basis of disability, compliance with the Federal Accessibility Requirements is a material condition of the federal government's decision whether to disburse loan or rent subsidy funds to private entities like Gray. That materiality is evidenced by the following:

a.    Congress's enactment of Section 504, pursuant to the authority of the U.S. Constitution's Spending Clause, to ensure recipients of federal funds were bound by the material requirement that they not discriminate on the basis of disability.

b.    USDA/RD's promulgation of regulations underscoring the importance of the Federal Accessibility Requirements to recipients of funds from the USDA. Starting in 1982, and continuing for over thirty years, USDA/RD promulgated regulations holding recipients of its funds accountable for meeting Federal Accessibility Requirements, and strengthened those regulations on multiple occasions, including in 1990, 1996, 1999 and 2004. The USDA/RD regulations at 7 C.F.R. pt. 3560 are specifically aimed at recipients of loan and rental subsidy programs, and explicitly reiterate the need to comply with the Federal Accessibility Requirements. By way of example: 7 C.F.R. § 3560.60(d) requires that all properties meet the Federal Accessibility Requirements; 7 § C.F.R. 3560.102(j) requires that all management agents execute a management certification agreeing to follow all federal laws; and 7 C.F.R. § 3560.104 requires borrowers to follow fair housing laws in project operations, including specific accommodation requirements.

c.    USDA/RD regulations which specify that compliance is a condition of payment. In addition to compliance being required by the Federal Accessibility

37

Requirements, USDA/RD has made clear that lack of compliance prohibits receipt of further USDA/RD funds. At 7 C.F.R. § 3560.55(b)(2), USDA/RD provides that recipients of Section 514/515 loans must be in compliance with, inter alia, Section 504 in order to be eligible to receive additional loan funds. The USDA/RD handbook also describes the Federal Accessibility Requirements, and states that noncompliance can result in "ineligibility to receive further loan funds," in addition to "penalties, liabilities, or loss of tax credits that may result from legal action brought against [recipients of USDA/RD assistance] by third parties." U.S. Dep't of Agric., HB-2-3560, Asset Management Handbook, App. 5, p. 8. The quoted language is included in Agency letters notifying borrowers of their non-compliance. *See id.*

d.      USDA/RD regulations also set up a robust system for monitoring compliance with Federal Accessibility Requirements. USDA/RD staff work with developers to ensure compliance with the Federal Accessibility Requirements, and the other requirements of the program. This includes conducting on-site reviews of developments receiving USDA/RD funds to assess compliance. USDA/RD regulations are clear that, while the system is meant to use Agency resources to help ensure compliance, it does not absolve USDA/RD recipients of the need to comply with all Federal Accessibility Requirements and USDA/RD regulations. 7 C.F.R. § 3560.352(c) ("Agency monitoring activities do not diminish borrower operation and management responsibilities and do not relieve borrowers from any Agency requirements including . . . [t]he terms of all agreements with the Agency . . . [and] Title VIII of the Civil Rights

38

Act of 1968 ["FHA"]. . . section 504 of the Rehabilitation Act of 1973, . . . [and] Americans with Disabilities Act of 1990"). The Agency is also permitted to offer incentives to borrowers, including additional rental assistance payments, but any deficiencies in project compliance with Section 504 must be addressed as part of the development of the incentive and must be completed as part of an acceptance agreement of any incentive. 7 C.F.R. § 3560.656(e).

e.     The USDA/RD forms described above at ¶ 62, which require certifications of compliance with the Federal Accessibility Requirements.

f.     Related USDA/RD regulations which make clear the Agency's focus on accessibility. For example, USDA/RD requires that all leases between eligible occupants and borrowers must contain certain required items and provisions, including that the housing project is subject to the FHA and Section 504. 7 C.F.R. § 3560.156(c)(6).

g.     McGuinn, as the agency official charged with overseeing Gray's properties, reiterated the importance of compliance on countless occasions, including specifically telling Gray to update their Transition Plans and do the work listed in them to bring the property into compliance.

h.     On June 20, 2017, the Acting Administrator of the Rural Housing Service for the USDA, Richard Davis issued a letter emphasizing the need to recommit to compliance with accessibility requirements. The letter described the Federal Accessibility Requirements applicable to recipients of USDA/RD rural housing loans in detail, and noted that, while USDA approves budgets necessary to accomplish Transition Plans, the

39

USDA (except for the Secretary of Agriculture) cannot waive accessibility requirements because of financial impracticability. As of the date of that letter, no Secretary of Agriculture has ever waived an accessibility item due to "undue financial burden."

      i.      In July 2019, HUD announced that it would withhold $80 million in federal funding from the City of Los Angeles because of its failure to comply with federal accessibility laws. After negotiations, Los Angeles and HUD agreed to a historic voluntary compliance agreement, in which the City agreed to retrofit 3,100 accessible housing units for persons with disabilities, among other relief.

      j.      On November 4, 2019, the DOJ settled a lawsuit it brought against the Housing Authority of the City of Bridgeport, CT ("HACB"), for failure to ensure its affordable housing program was compliant with the Federal Accessibility Requirements. Specifically, the DOJ alleged that the HACB violated Section 504, the FHA and the ADA by, inter alia, failing to provide a sufficient number of public housing units that are accessible to tenants with disabilities. The settlement requires HABC to implement changes to its housing facilities, programs, policies and practices; develop an inventory of accessible units; and pay $1,500,000 to those hurt by its discriminatory practices and a $25,000 civil penalty to the United States in damages. The lawsuit arose from a compliance review initiated by HUD. After issuing a determination of noncompliance and attempting resolution, HUD referred the case to the Justice Department.

94.     As a consequence of Gray's false statements, records, certifications and requests for payment, the federal government has been cheated out of hundreds of highly accessible

40

apartment units that federal law requires be made available to people with mobility impairments.

95.    Moreover, people in need of the highly accessible units have also been deprived of the opportunity to live in apartment complexes owned or managed by Gray, and many of these people have been relegated to living in inaccessible or inappropriate institutional settings because of Gray's failure to comply with the Federal Accessibility Requirements.

96.    In essence, Gray lied to the federal government in order to secure the federal funds mentioned above. That is precisely the conduct Congress sought to prevent in passing and strengthening the False Claims Act.

## INJURY TO THE UNITED STATES

97.    As a result of Gray's actions described above, the United States has been directly and substantially injured in that USDA/RD has paid as much as $90 million to Gray and it has not received—for its own benefit and that of low-income people with disabilities who live (or seek to live) in affordable housing developments financed with capital or monthly rental subsidy funds from USDA/RD—the accessibility features required by federal law.

98.    By failing to provide the accessibility required by federal law, Gray has delivered a product that effectively excludes many people with disabilities from living in its affordable rental housing units.

99.    Each time Gray designed and constructed covered dwellings that did not comply with the Federal Accessibility Requirements, and did not remedy its noncompliance, it shortchanged the Government, and deprived individuals with disabilities of the opportunity to live in accessible rental properties.

41

## CAUSE OF ACTION
### Count I
### False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A)-(B)

100.    Relator realleges and incorporates by reference the allegations contained in ¶¶ 1-99 above as though fully set forth herein.

101.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729–3733, as amended.

102.    By and through the acts described above, Defendant has knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

103.    By and through the acts described above, Defendant has knowingly made or used, or caused to be made or used, false records or statements to get the United States to pay or approve false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

104.    By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

105.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against Defendant as follows:

106.    That Defendant cease and desist from violating 31 U.S.C. §§ 3729–3733;

107.    That this Court enter judgment against Defendant in an amount equal to three

42

United States of America, ex rel. Margaret McGuinn v. J.L. Gray Company, Inc.
COMPLAINT

times the amount of damages the United States has sustained because of Defendant's actions, plus the maximum civil penalty permitted for each violation of the False Claims Act;

108.    That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

109.    That Relator be awarded all fees, costs and expenses incurred in connection with this action, including attorneys' fees, costs and expenses; and

110.    That Relator recover such other relief as the Court deems just and proper.

43

United States of America, ex rel. Margaret McGuinn v. J.L. Gray Company, Inc.
COMPLAINT

1

## DEMAND FOR JURY TRIAL

2

111.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby

3

demands a trial by jury.

4

5

Dated this 10th day of January, 2020.

6

7

Respectfully Submitted,

8

/s/ Reed Colfax

9

Michael Allen

10

Kali Schellenberg
Reed N. Colfax, Bar No. 9302

11

RELMAN COLFAX, PLLC
1225 19th Street, NW, Suite 600

12

Washington DC 20036
Telephone: (202) 728-1888

13

Fax: (202) 728-0848
mallen@relmanlaw.com

14

kschellenberg@relmanlaw.com
rcolfax@relmanlaw.com

15

Robert K. Collins

16

COLLINS LAW OFFICE, LLC
P.O. Box 4786

17

Olathe, Kansas 66063
Ph: (913) 538-7472

18

robert@collinslegal.com

19

*Attorneys for Relator*

20

*Pending admission *pro hac vice*

21

22

23

24

25

26

44

27

United States of America, ex rel. Margaret McGuinn v. J.L. Gray Company, Inc.

28

COMPLAINT

29